38

**FIORELLI, Estate of, In re.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23767.. Decided May 23, 1956.

Nicola & Horn, for appellee.
Harold Weinstein, for appellant.

**OPINION**

By SKEEL, J:

This appeal comes to this court on questions of law from a final order

approving the fifth partial account of the testamentary trustee (filed October 14, 1955) and overruling the objections of the beneficiary of the trust filed by her guardian ad litem appointed for the purpose of presenting objections to the account.

Lucia Fiorelli died early in 1938, leaving an estate consisting of some personal property, personal claims of doubtful value and a four-family house located at 15802 Halliday Avenue in the City of Cleveland. Her will was admitted to Probate and one of her daughters, Clara Fiorelli was appointed executrix as requested by the will. After providing for certain specific bequests of the household furnishings, other chattels and money, the will provides in Items 6 and 7 as follows:

"ITEM 6. I hereby give, devise and bequeath one-half of all the rest and residue of my property to my daughter, Clara Fiorelli, she to have and to hold the same unto herself and her heirs forever.

"ITEM 7. I hereby give, devise, and bequeath the remaining one-half of my property unto Clara Fiorelli, as Trustee for my granddaughter, Joan Fiorelli, until Joan Fiorelli arrives at the age of twenty-one years. Thereafter, said property shall become the property of my said granddaughter and shall be turned over to her, and my said granddaughter shall have and hold the same unto herself and her heirs forever.

"My said daughter, Clara Fiorelli, as such trustee, is hereby given full power and authority to sell any part or all of the property herewith left to her as such trustee and is hereby authorized and empowered to execute any bill of sale or deed of conveyance and to take back any note and/or mortgage that she may deem proper to take for a part of the purchase price of any or all of said property, and that she may invest and reinvest the same in any manner she deems proper.

"I hereby empower my said trustee and authorize her to make any payments for and on behalf of the education of said Joan that she may deem for the best interest of said Joan, and to pay for any medical attention that may be needed for the proper care and maintenance of said Joan, and is hereby also empowered and authorized to pay for the care and maintenance of said Joan in the event Joan's father, my son Nicholas, is unable to properly keep and maintain her."

Clara Fiorelli was appointed testamentary trustee May 13, 1938, and on May 23, 1938, a bond in the sum of $1,000 (as ordered by the court in granting the application) was filed and approved and letters of trusteeship issued. On the same day the trustee applied for authority to pay out of funds received as rent and held in part in the trust estate an amount necessary to discharge certain of the then unpaid "legacies" (bequests) to avoid a land sale proceeding. This motion was granted and the first partial account shows that on October 14, 1938, the trustee charged the trustee's account $614.80 on such authority and the administration of the estate was then closed.

The house, one-half of the ownership being in Clara Fiorelli and the other one-half in Clara Fiorelli, Trustee for Joan Fiorelli, a minor, until Joan became of age, as shown by the provisions of the will above quoted, was built sometime prior to 1916 as a two-family house. In 1917, two more suites were added to the rear. There are two separate basements, one for the front suites and one for the rear suites.

The trustee has lived in the front downstairs since the house was built, at first with her family, which included her sister, Elizabeth. Elizabeth married Andrew Marfongella in 1937 and they took up their residence there. After her mother's death, the trustee continued to live in this suite with her sister and brother-in-law, Mr. and Mrs. Marfongella, and since the death of Mr. Marfongella, the two sisters occupied this suite together. When the Marfongellas were married in 1937 and came to live in Suite No. 1 at 15802 Halliday Avenue, they paid Mrs. Marfongella's mother $25.00 per month for only partial occupancy with the rest of the family. After the death of Lucia Fiorelli, the mother, the Marfongellas then paid Clara Fiorelli, trustee, $25.00 per month for like occupancy until the death of Mr. Marfongella. Since then Elizabeth Marfongella has continued to pay $25.00 rent per month to her sister, which amount has been returned by the testamentary trustee, Clara Fiorelli, as the income from Suite No. 1. Clara Fiorelli has paid no rent as compensation for occupying Suit No. 1, after her mother's death other than the payments ($25.00 per month) received from her brother-in-law, Andrew Marfongella, and after his death, from her sister. The right of Clara Fiorelli to reside in the family home without compensation by family agreement must end upon the death of the head of the household and owner of the property. The use of one-half the two-car garage by the Marfongellas was permitted by the trustee at no extra cost. Suite No. 1, occupied by the trustee and her sister, consists of five rooms in the front on the first floor of 15802 Halliday Avenue. In 1942, the Trustee installed two new coal furnaces, each to service two suites, at an expense of $825.00. In August of 1947, the account shows an expenditure of $150.00 for paper hanging. Since all of the other tenants deny that any decorating was done in their suites after they moved in, this work must have been done in the trustee's suite. In 1948, the trustee had the coal furnace, installed in 1942, servicing her suite and the suite directly above, removed and two new gas furnaces (one for each suite) installed at a cost of $1,000.00. The same thing was done for the two rear suites in 1950 at a cost of $974.00 so that in a little over seven years about $2800.00 was spent for furnaces.

In 1953, the trustee employed The Cleveland Tile and Cabinet Company to remodel the kitchen and bathroom in her suite at a total expense of $2027.00. This work included tiling the wall of the kitchen up about five and one-half feet from the floor, putting in a new stainless steel kitchen sink with cabinets below, marble window sills, sliding towel bar, sanitas wall coverings in place of paper and wall register. She also had an incinerator installed in the basement under her suite at an expense of $147.62. She also installed certain plumbing to provide for an automatic washing machine, including new laundry trays for her exclusive use, and repairs to the kitchen sink installed two years before at a cost of about $190.00 and a new overhead door for the garage, used by her sister, Mrs. Marfongella, at a cost of $190.40. At the time of the remodeling of the kitchen, the trustee expended considerable money to redecorate the suite. The total amount of money expended in the suite occupied by the trustee and the garage used in connection therewith for the period of the fifth partial account would equal more than ten

years rent received for its use without considering payment for water rent, trustee's fees, taxes and insurance paid by this trustee out of income and is the only suite in the building where the rent has not been increased since fixed in 1938 for only partial occupancy.

The suite on the second floor above that which is occupied by the trustee was vacated by the DeMarcos on April 15, 1946, who were then paying rent at the rate of $30.00 per month. The suite was vacant until November 1, 1946, when it was rented to F. Mistichelli at a rental of $40.00 per month. The rent for this suite has not since been changed. While vacant, a new kitchen sink at a cost of $160.14 was installed, and this suite was competely redecorated and the floors sanded and varnished. Since that time, no painting or paper hanging has been done in this suite. There is some claim that the trustee's sisters helped do this work as a supporting reason for low rent. The account shows that at least some part of the work was done by others because while this suite was vacant the trustee paid $21.50 for paper hanging and the bill indicated the work was done in the kitchen. Except as to Suite No. 2, which was redecorated before being rented to the Mistichellis, and the work done in the trustee's suite, no money has been expended for decorating purposes on any of the suites other than that done by the tenants, themselves.

The suite on the first floor in the rear is occupied by a sister of the trustee (Susie Petrecca) and her husband. Mr. Petrecca uses one-half of the garage which has been built into a storeroom. He now uses it to store a tractor recently purchased. He is engaged part time as a landscape gardener and keeps his tools in the storeroom for which no extra charge is made. The Petreccas paid rent at the rate of $20.00 per month, beginning in 1938, for this four-room suite, including one-half of the garage. In 1950, when the new gas furnace was put in, the rent was increased to $30.00 per month.

The four-room suite on the second floor in the rear has been occupied by Mr. and Mrs. Bellini since 1943. The rent at the beginning of their tenancy was $25.00 per month. It continued at that rate until 1950, at which time the new gas furnace was put in, and the rent increased to $35.00 per month. August Bellini testified that aside from the repair or rebuilding of the back porch, which had rotted out, and a replacing of a toilet bowl, no repairs have been expended by the trustee in his suite and that he has taken care of his own painting and paper hanging. He said: "My wife and I, we Kemptoned." It should be observed that if the back porch disintegrated into such a dangerous condition as to require extensive repairs or rebuilding, it must have been at the neglect of the trustee who was in complete charge for eleven years before the work was done.

Elizabeth Marfongella, sister of the trustee, who lives with her, in explaining the low rent she was called upon to pay, claimed to be the plumber, electrician, janitor and jack-of-all-trades in the maintenance of the building. She testified:

"Q. Are you doing janitor work at this place?

"A. Yes, sir.

"Q. Do you expect to be paid for that?

"A. My sister gave me a break and I am giving her a fair break.

"Q. What kind of a break did your sister give you?

"A. Living with her at low rent * * *.

"Q. Do you ever cut the grass?

"A. We don't have any grass. * * *

"Q. When was the last time you ever made any plumbing repairs in a suite other than your own?

"A. I can't remember."

One expert witness was called to testify as to what tenants occupying property like the suites at 15802 Halliday Avenue were required to pay in the vicinity. He said that since rent control was removed, thirteen to fourteen dollars a room would be a reasonable charge. This would make the suite occupied by the trustee worth $65.00 per month and the back suites $52.00 per month. This evidence is not challenged by any other competent testimony. There is no evidence as to what the rent levels were as filed with the Office of Rent Control. In fact such control seems not to have been complied with or given consideration at any time after the law became effective in 1943.

It is suggested that the trustee is the owner of one-half of the property and has a right to live in the property without charge. Such fact is without significance when it is shown by the record that in her accounting, she retains one-half of the total income as belonging to her as of right, including the $25.00 paid to her by her sister after deducting a five per cent trustee's commission for collecting the rent and other management services.

The court, in its memorandum opinion, seems to have based the overruling of the exceptions on the ground that the low rent is justified because of janitor service. The court said: "On the other hand, there is testimony to the effect that the rentals charged and collected by the trustee were adequate, having in mind the kind and type of property involved and the fact that the tenants, who were relatives of the trustee, furnished janitor service and other work and labor incident to the matter of maintenance for which no charge was made." There is not a word of admissible testimony that the rentals charged were adequate for the type of property nor is there anything in the record to justify the conclusion that janitor service was a service due the tenants. The evidence is just to the contrary. Separate furnaces are provided for each suite and the tenants who testified indicated that each took care of his own needs. It would indeed be unusual to consider that janitor service could be considered as a provided service under the undisputed circumstances surrounding this property and the amount of rent paid by each tenant. The question could be logically asked—who was the janitor and who was entitled to the service?

The argument is made that the trustee carried on, in the management of the property, as did the settlor (her mother) during her lifetime. Whatever the settlor did in dealing with her property, no one has a right to question, particularly where most of the tenants were her children. One has a right to deal with his property as he may desire. A trustee, however, cannot seek shelter from improvident or overly generous conduct toward herself and other tenants, some of whom are relatives of the settlor because that was the way the settlor dealt with those in

possession of her property during her lifetime. A trustee is charged with the absolute necessity of protecting the trust estate with the utmost fidelity in the interest of the beneficiary. In this case that means collecting a reasonable rent under the economic conditions of today and not to continue rents or a slight variation of them as charged in the depths of the depression. Here the undisputed evidence discloses a conflict of interest between the trustee and the beneficiary which the trustee has resolved and continues to resolve in her own favor. For nine years, during rapidly changing economic conditions, including marked advances in rents charged for every class of residence property (a fact which is known to everyone), the trustee has neglected to report her stewardship of the property to the court or do anything except to add to the comfort of the suite occupied by her in part at the expense of the trust estate and enjoy rents at a level far below those charged for like property in the immediate vicinity.

We must conclude that the order of the Probate Court, overruling the exceptions to the fifth partial account of the trustee, is against the manifest weight of the evidence and is, therefore, reversed and the cause remanded for further proceedings.

Exceptions. Order see journal.

KOVACHY, PJ, HURD, J, concur.